**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LEE J. DORFMAN, individually and
d/b/a ADEPT OF SAN FRANCISCO
and iDICTATE,

    Plaintiff,

    v.

RICHARD JACKSON, individually and
d/b/a CYBERSECRETARIES; and
DRUID GROUP, INC. d/b/a
YOUDICTATE,

    Defendants.
_____/

No. C 05-1791 PJH

**ORDER GRANTING MOTION TO TRANSFER CASE**

Defendants' motion to dismiss the complaint for lack of personal jurisdiction, and alternative motion to transfer venue to either the Western District of Texas or the District of Montana came on for hearing before this court on July 6, 2005. Plaintiff appeared by his counsel Daniel O'Rourke and Carol Ruth Silver, and defendants appeared by their counsel Susan E. Foe. At the hearing, the court ordered additional briefing on the motion to transfer. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion to transfer the case to the District of Montana.

## BACKGROUND

Plaintiff Lee Dorfman ("Dorfman") resides in San Francisco, California, and does business under the name, "Adept of San Francisco." Defendant Druid Group, Inc. ("Druid") is incorporated in Texas, and operates an Internet-based transcription service known as "CyberSecretaries." Defendant Richard Jackson ("Jackson") is a resident of Texas, who lives part of the time in Montana. Jackson is the President and CEO of Druid.

In 1997, Jackson was involved in the creation of CyberSecretaries. This service allows customers to dictate documents for transcription by calling a 1-800 number or by fax or e-mail. The service is available 24 hours a day, 7 days a week. After the customer completes the dictation, the document is transcribed, proofread, and e-mailed to the customer's computer, usually within 24 hours. The "transcriptionists" are independent contractors, and do not work from any centralized location operated by Jackson or Druid.

According to Jackson, at the time CyberSecretaries was founded, its management function was based in Dallas, Texas. Around 1999, CyberSecretaries was operated from Dallas and also from Whitefish, Montana. Around 2000, it was operated solely out of Montana. Starting in 2005, the company's principal management was transferred to Austin, Texas.

Dorfman claims that his attorney Carol Ruth Silver introduced him to Jackson and Druid in April 1999, after Silver met Jackson a trade show in California (Legal Tech). Jackson had come to California to promote CyberSecretaries. Dorfman claims that the CyberSecretaries business model was similar to a business that he was developing "in that a service was offered over the telephone or Internet and it relied on a remotely located outsourced staff." According to Dorfman, he then negotiated with Jackson over the next few months, on the telephone and by e-mail, regarding his desire to work in some capacity with CyberSecretaries.

Defendants' version of events differs from Dorfman's. Jackson asserts that Dorfman originally contacted Druid on its 1-800 number in early 1999, and that the purpose of the call was to inquire about the possibility of becoming a salesperson for Druid's CyberSecretaries

2

services. Jackson says he spoke to Dorfman himself and told him that Druid had no need of Dorfman's claimed business contacts and expertise in sales. According to Jackson, Dorfman followed up the call with a further inquiry as to whether he might be able to develop a private label version of CyberSecretaries service, which he wanted to market and sell as "iDicate." Jackson says he told Dorfman he was not interested, but Dorfman continued to press, claiming to have extensive sales contacts and an established sales organization, which could greatly benefit Druid at its particular stage of business development. Jackson claims that when he asked Dorfman what amount of money he was willing to bring to the joint effort, Dorfman expressly represented in writing that he intended to spend $50,000 per month in promoting the service. According to Jackson, it was on that basis that the parties continued to negotiate.

Jackson claims that the negotiations were conducted by telephone, or, in one instance, in-person in Montana. Jackson says he was located either in Texas or Montana during this period, and asserts that he never came to California (after the one trip to attend the trade show). Dorfman was located in California during that time, and he claims that a large percentage of his customers are also located in California. He asserts that Jackson understood that Dorfman's business would be based in San Francisco. He says he understood that he was dealing with a Texas corporation that was doing business in Texas. Nevertheless, as Jackson points out, Dorfman was aware that Jackson was living in Montana, as he visited Jackson there, and called, wrote, and e-mailed Jackson there.

After six months of negotiations, Dorfman entered into a joint venture with Jackson and Druid in June 1999. Dorfman mailed the executed contract to Jackson in Montana. The parties signed an addendum to the agreement in February 2000. Pursuant to the joint venture agreement, the parties agreed that Dorfman would promote the CyberSecretaries dictation service under his own brand name, and would locate potential users from his offices in San Francisco, while CyberSecretaries would provide "fulfillment services." That is, CyberSecretaries would receive the voice files from Dorfman's customers, distribute the files to typists, do the billing, and collect the money. For his efforts in providing customers,

Dorfman would receive a commission – a percentage of the revenue.

The parties also agreed that a new company would be created – referred to in the joint venture agreement as "the New CS Company" – which would provide the dictation transcription services described in the agreement. The parties would work together to enable Dorfman's company to promote "New CS Company's" services to the clients of Dorfman's company.

Dorfman claims that during the course of the contract, Jackson and Druid frequently provided Dorfman's iDictate customers with service inferior to Jackson's own direct customers of CyberSecretaries and YouDictate. For example, according to Dorfman, Jackson sometimes allocated all his resources to CyberSecretaries' customers, and allowed iDictate jobs to sit for days. Dorfman also contends that Jackson directed Druid to ignore service requests from iDictate customers, and repeatedly ignored Dorfman's efforts to conduct the business of the joint venture as contemplated under the contract. He claims that when there was a service interruption, service was routinely restored more quickly to customers of CyberSecretaries than to customers of iDicate. He also asserts that when customers of iDicate called to request customer service, their calls were not answered by CyberSecretaries, but were routed to a voice mailbox, which was often full and would not accept messages. Other times, messages were lost.

According to Dorfman, following a period of inferior service, and attempts by Jackson to steal Dorfman's customers (by persuading them to use CyberSecretaries instead of iDictate), Jackson and Druid shut down all transcription services for iDictate customers in March of 2005. This event finally prompted him to file the present action.

Dorfman filed the complaint in the Superior Court of California, County of San Francisco, on March 21, 2005, asserting causes of action for breach of contract, common counts (money due, and for work and services rendered), fraud, unfair competition, and interference with advantageous business arrangements, and seeking damages in excess of $5,000,000.

In the breach of contract cause of action, Dorfman alleges that Jackson and Druid

4

1  failed to pay him commissions in the amount of $299,000, as required under the joint venture
2  agreement. In the fraud causes of action, he alleges that Druid and Jackson either
3  intentionally or negligently misrepresented that they would cooperate with him in developing
4  markets and customers for transcription services through iDicate, and would provide fulfillment
5  of orders at the same level of service as for customers of CyberSecretaries, but that they
6  failed to provide equal services. In the claims for intentional interference with advantageous
7  business arrangements and unfair competition, Dorfman asserts that defendants drove his
8  customers away, and seeks $5,000,000 for destruction of his business, iDictate.
9       On March 23, 2005, the superior court granted Dorfman's application for a temporary
10 restraining order and issued an order to show cause re preliminary injunction. On April 22,
11 2005, the superior court granted Dorfman's motion for preliminary injunction, ordering
12 Jackson and Druid to cease interfering in the operation of Dorfman's business, also finding
13 that the court had personal jurisdiction over Jackson and Druid (but without making any
14 detailed findings). Defendants removed the case on April 29, 2005, alleging diversity
15 jurisdiction.
16      Meanwhile, on April 14, 2005, C/S Dorfman Operating Company, Inc. ("C/S Dorfman"),
17 a Montana corporation, filed suit against Dorfman individually and d/b/a Adept of San
18 Francisco in the U.S. District Court, District of Montana (Missoula Division), alleging that
19 Dorfman failed to provide the money ($50,000 per month) and marketing services he had
20 promised, that he libeled and disparaged C/S Dorfman, and that he breached his fiduciary
21 duties as a party to the joint venture. C/S Dorfman asserted causes of action for breach of
22 contract, declaratory judgment, business disparagement and defamation, breach of fiduciary
23 duty, interference with contract and contractual relations, unlawful misappropriation and
24 conversion, fraud and misrepresentation, and seeking damages, declaratory relief, an
25 accounting, and imposition of a constructive trust. Dorfman filed a motion to dismiss for lack
26 of personal jurisdiction on May 31, 2005, but the clerk's docket reflects nothing further
27 happening in the case.
28      In his declaration in opposition to the present motion to dismiss, Dorfman claims that

he had never heard of CS/Dorfman prior to being served with the complaint in the Montana action. However, the complaint in that suit alleges, and Jackson asserts in his declaration, that CS/Dorfman was the "New CS Company" that was formed pursuant to the joint venture. Jackson claims that Dorfman was aware of the formation of CS/Dorfman, and suggests that the joint venture agreement had been premised on the understanding that Druid/Jackson would only agree to the joint venture if a new, separate corporation were set up. In his reply declaration, Jackson adds that Dorfman was notified in writing on July 20, 2000, that a new company had been formed – CS/Dorfman – to handle the contracting with Dorfman.

Jackson and Druid now seek an order dismissing the complaint in the present action pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. In the alternative, they seek an order pursuant to 28 U.S.C. § 1404(a) transferring venue to either the Western District of Texas at Austin, or the District of Montana, at Missoula. Dorfman opposes the motion, arguing that the court has personal jurisdiction over the defendants, and that there is no justification to transfer the case as California is a just and convenient forum to determine this dispute. Dorfman also requests that if the court is inclined to find that plaintiff has not established a prima facie case of personal jurisdiction, plaintiff should be allowed discovery on the jurisdictional issues.

**DISCUSSION**

A.  Motion to Dismiss

At the July 6, 2005, hearing, the court stated that it had determined that it had no jurisdiction over Jackson, and that the motion to dismiss as to Jackson would be granted. The court also indicated that it had jurisdiction over Druid, and that the motion as to Druid would likely not be granted. Nevertheless, because the court finds that transfer to the District of Montana is proper, and because the motion to dismiss and the motion to transfer were made in the alternative, the court does not now reach the question of personal jurisdiction.

B.  Motion to Transfer Venue

1.  Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court

6

may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404( a).  Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citation omitted).  Thus, in considering whether to grant a motion to transfer, the district court may consider any of a number of "case-specific factors."  See id.

Those factors include the convenience of parties, the convenience of witnesses, judicial economy, the relative ease of access to proof, familiarity with governing state law (in diversity cases), the relative means of the parties, relative docket congestion, and ability to monitor compliance with any injunction that may be granted.  See Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2004) § 4:269, et seq.  Other factors include the plaintiff's choice of forum, the respective parties' contacts with the forum, the contacts relating to the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the two forums, and the availability of compulsory process to compel attendance of unwilling non-party witnesses.  Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000).

The party requesting the transfer has the burden of showing a " clear balance of inconveniences" against it if the action remains in the original venue, Futures Trading Comm'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979), and a motion to transfer should be denied if the moving party merely prefers another forum, or if the result of transfer would merely be to shift the inconvenience of litigation from one party to another, Van Dusen v. Barrack, 376 U.S. 612, 645-46 (1964).

2.   Defendants' Motion

Defendants argue that if the court finds that it has personal jurisdiction over either Jackson or Druid, the case should nevertheless be transferred to either Montana or Texas under 28 U.S.C. § 1404(a).  Defendants contend that the case "might have been brought" in Montana or Texas because for most of the time material to this lawsuit, both Jackson and Druid's operations were located there.  Today, Druid's operations are located in Texas, and Jackson has residences in both Montana and Texas.  Defendants argue that either of these

7

1   locations would be convenient for Jackson, Druid, and any witnesses.

2         Defendants argue that transferring the lawsuit would simply shift inconvenience
3   between the parties. They contend that this factor is therefore neutral and does not favor
4   either side.

5         With regard to the convenience of witnesses, defendants assert that there are several
6   key witnesses residing in Texas or Montana, and specifically identify seven:

7         a.    Defendant Richard Jackson maintains offices in both Texas and
8   Montana and travels between the two states periodically. He spends no time in California. He
9   will testify regarding his dealings and conversations with Dorfman, and the specific subject
10  matters comprising Dorfman's claims in this suit.

11        b.    Ginger Magers is a resident of Montana and an employee of
12  Consolidated Payroll. She is one of two workers who staffs the "Help" desk for
13  CyberSecretaries. She is paid a wage, and the loss of wages and the expense and time
14  away from work will be costly and disruptive, both to her and to CyberSecretaries. She will
15  testify that transcription jobs for Dorfman's clients were treated no differently than any other
16  transcription jobs.

17        c.    Michael Stevens is a resident of Montana and an employee of
18  Consolidated Payroll. He is the second worker who staffs the "Help" desk for
19  CyberSecretaries. He is paid a wage and would find it difficult to travel outside of Montana to
20  attend a trial in California, both because of economic considerations and because of his
21  family situation (wife employed outside the home, two young children). He will testify that
22  transcription jobs for Dorfman's clients were treated no differently than any other transcription
23  jobs.

24        d.    David Bardwick is a resident of Montana and an employee of CB-TX
25  Transcriptions, Inc. He has been involved with CyberSecretaries since its inception, and is
26  presently the head of technology services for CyberSecretaries. He closely supervises seven
27  staff technicians, and his extended absence to attend the trial could be disastrous if a
28  technical problem or interruption of service were to occur during that time. Bardwick dealt

United States District Court
For the Northern District of California

directly with Dorfman in setting up Dorfman's service, and will testify to those facts as well as to the technical aspects of the CyberSecretaries system, the handling of Dorfman's client jobs, and possible delays in computer service.

   e. Heidi Taft is a resident of Montana who is employed by AT&T.  She worked directly with Dorfman in setting up telephone lines in Montana for his service and arranging for billing to be done through Druid's address in Whitefish, Montana.  She may also testify regarding possible causes of misrouting of calls, if any, by Dorfman's clients.

   f. Roxanne McHenry is a resident of Montana and is one of Dorfman's clients.  She may testify regarding Dorfman's allegations that his clients did not have their transcription orders filled the same as CyberSecretaries' customers, and that they had their transcription services cut off.

   g. BumbleB Media, Inc., is located in Montana and is one of Dorfman's clients.  A representative of this company may testify regarding Dorfman's allegations that his clients did not have their transcription orders filled the same as CyberSecretaries' customers, and that they had their transcription services cut off.

  Defendants contend that none of these witnesses, except for Jackson, is within the subpoena power of this court.  Defendants argue that the unavailability of compulsory attendance of these witnesses is a factor that weighs in favor of transfer, as is the possibility that these witnesses would not be available to give live testimony at trial, and the disruption to the businesses of the witnesses' employers were they to travel to California for the trial.

  With regard to the "interests of justice," defendants argue that the plaintiff's choice of forum should not be accorded much weight here, because the subject matter of the litigation is not substantially connected to California.  Defendants claim that the operative events in this case occurred in Montana and the principal witnesses are located there, and that California has no particular interest in the parties or the subject matter of the case.  Defendants also assert that while there are serious doubts as to personal jurisdiction over Druid and Jackson in California, there is no question that there is personal jurisdiction over Dorfman in Montana, and in fact, there is currently pending an action involving these same parties in Montana.

Defendants claim that the existence of related litigation in Montana favors transfer there, as does the fact that the Joint Venture Agreement was negotiated and executed in Montana.

Dorfman opposes the motion to transfer.  With regard to the convenience of parties, he acknowledges that a mere shift in the balance of convenience/inconvenience is not sufficient to justify a transfer.  Nevertheless, he asserts that it would be far more inconvenient for him to litigate in Montana than for defendants to litigate in California.  Dorfman is an individual residing and doing business in California, who describes himself as a "one man show."  He claims that Druid is a large and profitable corporation with several subsidiaries and substantial assets, and notes that Jackson has stated that he routinely travels between his two homes in Montana and Texas.

With regard to the convenience of witnesses, Dorfman asserts that there are far more non-party witnesses located in California than there are in Montana.  He identifies seven witnesses:

    a.    Angela Langella is an employee of Laughlin, Falbo, Levy & Moresi in San Francisco, and a former customer of iDicate who left because of poor service.  She will testify regarding the service provided by defendants and the handling of iDicate customers by defendants.

    b.    Daniel McClennon is a San Francisco attorney who will testify regarding the lack of customer support given to iDictate customers.

    c.    The person most knowledgeable at Law Commerce, a San Francisco business, will testify regarding Jackson's alleged tortuous interference with prospective contract.

    d.    Carol Ruth Silver, a San Francisco attorney whose name appears on plaintiffs' pleadings, will testify regarding the contractual relationship between Jackson and Dorfman and Jackson's efforts to harm Dorfman's business.

    e.    Jeff Slater, a California attorney, will testify regarding the mishandling and loss of iDictate files.

    f.    The person most knowledgeable at the San Francisco office of Kemper

Insurance will testify regarding Jackson's alleged efforts to steal iDictate customers.

        g.      Ernest Gonzalez, a California attorney, will testify regarding poor customer service, lost files, and delayed turnaround time for iDictate customers.

Dorfman also claims that defendants employ at least 12 typists in California on a regular basis, although he does not know the names or locations of these typists. Dorfman speculates that these typists may testify regarding the method of file distribution, the instructions provided by Jackson regarding iDictate customers, and the availability of typists at times when iDictate customers were ignored.

Dorfman argues that none of the above-described witnesses would be subject to process in Montana.

With regard to the interests of justice, Dorfman claims that justice would not be served by a transfer to Montana. He notes that while the court has made a "preliminary determination" that Druid is subject to the court's jurisdiction, no such determination has been made regarding Dorfman's contacts with Montana. He argues that the Montana court might grant his motion to dismiss for lack of personal jurisdiction.

Dorfman also contends that the cost of litigation will be minimized by keeping the case in San Francisco, as the Bay Area "contains a superior infrastructure to Montana with easy transportation options and multiple airports." He notes that defendants have hired Texas attorneys, and argue that there will be no cost savings in moving the case to Montana.

Finally, Dorfman argues that the plaintiff's choice of forum should not be lightly overruled. He asserts that the relationship between himself and defendants arose from Jackson's solicitation of business in California, and that the harm caused by defendants' alleged tortuous activity is felt by Dorfman in California. He argues that he was not forum-shopping when they filed suit in California, as he is a California resident who operates businesses in California.

The court finds that the motion must be GRANTED, and that the case should be transferred to the District of Montana. With regard to the convenience of parties, the court finds that the equities are fairly balanced. Choosing Montana over California would simply

shift the inconvenience from Jackson and Druid, to Dorfman.

With regard to the convenience of witnesses, the equities are also balanced, as it would be as much of a hardship for defendants' witnesses to come to California as it would be for Dorfman's witnesses to go to Montana. However, based on the description of the proposed testimony, Dorfman's witnesses mostly seem knowledgeable about iDictate's alleged bad service, from the consumer end (i.e,. lost files, delays in service, lack of customer support) and alleged efforts to steal business, while defendants' witnesses seem more familiar with how the whole system operates and whether there were differences between the service offered to CyberSecretaries' customers and that offered to iDictate customers. In general, the proposed testimony by defendants' witnesses appears to be more material to the claims alleged in the complaint than the proposed testimony by Dorfman's witnesses.

With regard to the interests of justice, and the remaining relevant factors, the factor of plaintiff's choice of forum favors California. Generally, there is a strong presumption in favor of the plaintiff's choice of forum. Ravelo Monegro v. Rosa, 211 F.3d 509, 513 (9th Cir.2000). Courts will generally not order a transfer unless the "convenience" and "justice" factors strongly favor venue elsewhere. Securities Investor Protection Corp. v. Vigman, 764 F.2d 1309, 1317 (9th Cir. 1985); see also Schwarzer, et al., § 4:281. However, if the plaintiff's chosen forum lacks any significant contact with the activities alleged in the complaint, the plaintiff's choice of forum will be given considerably less weight. Schwarzer, et al., § 4:284.

Here, plaintiff's chosen forum, California, has fewer contacts with the activities alleged in the complaint. The factor of the respective parties' contacts with the forums favors Montana, as Dorfman negotiated and executed the agreement in Montana, while Jackson has made only one trip to California. The agreement between Dorfman and Jackson was negotiated and executed in Montana. The transcription business is operated by telephone or over the Internet, and its only physical presence is in Montana. Thus, California's interest in the dispute between the joint venturers is significantly more limited than Montana's.

The factor of ease of access to proof slightly favors Montana, as all the witnesses, documents, and information relating to the operation of CyberSecretaries and CS Dorfman

are located there.  Some iDictate customers, with their complaints of bad service and attempts by Druid to steal business from Dorfman, are located in California.

The factor of the reach of subpoena power to secure witness attendance does not favor either forum.

The factor of feasibility of consolidation with an action pending elsewhere favors transfer to Montana, as there has been no motion made to transfer the Montana case to California.  Thus, transfer to Montana will help avoid duplicative litigation and presumably help prevent waste of time and money.

The factor of familiarity with the governing law favors neither Montana nor California, as the parties' agreement for some reason specifies that Arizona law shall apply.

The factor of relative docket congestion would probably favor Montana, although this factor is not an important one.

The factor of the relative means of the parties appears to favor Dorfman and California, as he claims that Druid is a large and profitable corporation and he is just a "one man shop" (although Dorfman provided no evidence to support either of these claims).

The factor of differences in cost of litigation in the two forums does not favor either state, as it will simply be a matter of shifting costs from one forum to another.

## CONCLUSION

The court finds that this action could have been brought in the District of Montana, and, after considering all the relevant factors, finds that the equities favor transfer.  Accordingly, defendants' motion to transfer the case to the District of Montana is GRANTED.

**IT IS SO ORDERED.**

Dated:  September 1, 2005

_____
PHYLLIS J. HAMILTON
United States District Judge

13